# In the

# United States Court of Appeals
## For the Seventh Circuit

———————

No. 04-1515

ANDRE MENDENHALL, SR.,

*Plaintiff-Appellant,*

v.

MUELLER STREAMLINE CO.,

*Defendant-Appellee.*

———————

Appeal from the United States District Court for
the Northern District of Illinois, Eastern Division.
No. 01 C 9740—**John Corbett O'Meara**, *Judge.*[*]

———————

ARGUED MAY 6, 2005—DECIDED AUGUST 19, 2005

———————

Before KANNE, ROVNER, and WOOD, *Circuit Judges.*

KANNE, *Circuit Judge.* Andre Mendenhall, Sr., worked in a Mueller Streamline Company warehouse from 1988 until he was terminated on August 28, 2001. After he was fired, he filed a Title VII claim alleging race discrimination, hostile work environment, and retaliation. Mueller moved for summary judgment on all three claims. Chief Judge Charles P. Kocoras granted summary judgment in Mueller's favor on the race discrimination claim, but denied the

———————

[*]  Of the Eastern District of Michigan, sitting by designation.

motion as to the hostile work environment and retaliation claims. The two remaining claims were set for trial and the case was transferred to Judge John Corbett O'Meara. On the trial's second day, Judge O'Meara ruled that a hostile work environment claim could not exist independent of a race discrimination claim. Mendenhall appeals this ruling. We vacate and remand.

## I.  Background

We begin with a brief rendition of the facts of the case, construing all facts in the light most favorable to Mendenhall. *See Simpson v. Merchants Recovery Bureau, Inc.*, 171 F.3d 546, 551 (7th Cir. 1999). Mendenhall's duties at Mueller involved picking orders, loading trucks, putting away stock, and cleaning. Various incidents during the term of his employment made Mendenhall, an African-American, feel he was being discriminated against and subjected to a hostile work environment. When he brought these incidents to the attention of his supervisor, Deborah Jones, a Caucasian woman, he was ignored or berated.

Mendenhall claims that two Hispanic co-workers, Eliseo Covarubbias and Ernesto Reyes, continually harassed him by making insulting references to his mother and calling him names in Spanish such as "black monkey" and "dog." In another incident, feces was smeared across Mendenhall's locker. Although Mendenhall complained about these occurrences numerous times, Jones did not investigate or discipline anyone. Instead, she told Mendenhall that she was "sick and tired of this discrimination bullshit of [his]."

Beginning in April 2001, the word "NIGA" appeared written in graffiti in approximately seventeen locations throughout the warehouse. Mendenhall and two other employees (one African-American male and one Caucasian male) told Jones that they were offended by the graffiti. Jones again did not investigate or discipline anyone for this

conduct. In fact, she did not even have the offensive graffiti removed. After repeated complaints from Mendenhall, Jones accused him of writing the graffiti himself to boost his discrimination claim. Mendenhall claims that Jones challenged him to "sue all you like, go to the EEOC; I am the law, I don't care about the EEOC; this company's got deep pockets; it will overwhelm you."

In the months preceding his termination, Mendenhall was disciplined several times. In June 2000, Mendenhall was given a disciplinary reprimand because he was working too slowly. On October 24, 2000, Jones issued a disciplinary warning to Mendenhall because he allegedly took a magazine into the restroom and remained there for 15 minutes while on the clock.[1] Mendenhall was issued a warning on April 4, 2001, for harassing his co-workers. Two weeks later, on April 19, Mendenhall was suspended for making a gun gesture with his hand toward Covarubbias and Reyes. Mendenhall claims that all of these disciplinary actions were unjustly imposed on him. He claims that he did not make the gun gesture and that Jones did not adequately investigate the allegation against him. Specifically, he argues that a co-worker who was with him at the time would have told Jones, if she had asked, that Mendenhall made no such gesture.

On August 28, 2001, Jones decided that Mendenhall was working too slowly because he had not finished picking an order by 11:15 A.M. In order to prove her point, Jones picked a duplicate order and claims she completed in 40 minutes what it took Mendenhall three hours to do. Then, after

---

[1] The district court ruled that these two disciplinary actions could not be considered as evidence of discrimination because they took place more than 300 days prior to the filing of the EEOC charge and thus are time barred. *See Billow v. Much Shelist Freed Denenberg Ament & Rubenstein, P.C.*, 277 F.3d 882, 892-93 (7th Cir. 2001).

stating that she had verbally warned him the day before to work faster, Jones fired Mendenhall.

On August 31, 2001, Mendenhall filed a race discrimination charge with the EEOC against Mueller. He received a right-to-sue letter and filed suit in the district court on December 20, 2001, alleging that he was subjected to a hostile work environment, race discrimination, and retaliation. On November 15, 2002, Mueller filed a motion for summary judgment on all counts. Chief Judge Kocoras granted the motion in part and denied it in part.

On the hostile work environment claim, the court found that the "frequent and humiliating" racist name-calling from co-workers, the "NIGA" graffiti which was not removed, and Jones's reaction to Mendenhall's complaints which "let Mendenhall know that she did [not] think his complaints of harassment were worthy of respect and that she was not going to do much [to] stop the harassment," was adequate evidence that there were disputed issues of material fact and that summary judgment must therefore be denied. The district court also denied summary judgment on the retaliation claim. On the race discrimination claim, however, the court granted summary judgment in favor of Mueller after finding that Mendenhall had failed to establish his *prima facie* case because he provided no evidence showing that he was performing his job satisfactorily or that similarly situated individuals were treated more favorably. The court scheduled trial for the remaining claims and the case was reassigned to Judge O'Meara.

Before the trial began, Mueller filed a number of motions *in limine*. In Motion *in Limine* #6, Mueller sought to prevent Mendenhall from presenting evidence about matters that had been disposed of by summary judgment. Judge O'Meara denied the motion, finding that Mendenhall "is barred from introducing evidence to establish a claim for race discrimination or any other dismissed component of

this action. The same evidence, however, is relevant to [Mendenhall's] allegation that the termination was retaliatory and part of an on-going pattern of harassment."

On the second day of the trial, February 18, 2004, Judge O'Meara shifted course. He stated that he had spent a sleepless night trying to understand what evidence was relevant to the remaining claims. He concluded that "Chief Judge Kocoras has ruled that there is no actionable race discrimination involved in this case. If there is no actionable race discrimination, there can be no actionable hostile environment." (Pl.'s App. at 112.) In other words, "without race discrimination or some other illegal behavior on the part of the employer, there is no actionable hostile environment[.]" (Pl.'s App. at 114.) Judge O'Meara stated that Mendenhall was permitted only to "proceed here with evidence that his suspension and discharge were in retaliation for his assertion of his legal rights . . . ." (Pl.'s App. at 116.)

At this point, it appears that the trial fell into a state of confusion. Mendenhall's counsel tried to understand the basis of Judge O'Meara's *sua sponte* ruling and then attempted to clarify what evidence he would be allowed to present. Counsel told the court that in order to prove his retaliation claim, he intended to question the witnesses about the derogatory graffiti and Jones's reaction to Mendenhall's complaints about the graffiti. Judge O'Meara said that he could not question the witnesses about the graffiti and stated that "[t]his case has to do with retaliation, and if you can't show . . . some causal connection between suspension and firing and the assertion by Mr. Mendenhall of the rights of himself and others under the law, the civil rights law, then you don't have a case. That's retaliation. Nothing else is relevant under my ruling." (Pl.'s App. at 124-25.)

After a short recess, Mendenhall's counsel told the court that he would like to take an interlocutory appeal based on the dismissal of the hostile environment claim because the

ruling materially affected his ability to continue with the case. Judge O'Meara agreed that an appeal was proper but suggested that:

> It might make sense for plaintiff, with whatever words you want to put around it, to say 'Given what the court has said, there is nothing more for us to do but rest at this point. We don't have any way to go forward, given what you have ruled,' and at that point if there were— even without a motion, at that point I could rule—I'm not saying I'll do this because I really am a little bit uncertain about how much you have to get to have the *prima facie* case on retaliation, but at this point it might be possible for the court to make a ruling that you didn't make your *prima facie* case out and therefore dismiss the case, which would posture it a lot better for an interlocutory appeal. It wouldn't look like it happened right in the middle of somebody's testimony. But you can think about that.

(Pl.'s App. at 135-36.) The court went on to say that "I know I have changed the signals on you substantially, and I guess I said it before, but I will do whatever I need to do to put you on the road to an interlocutory appeal. I'll do the district judge's job by saying I think you should be entitled to it." (Pl.'s App. at 137.) Mendenhall's response to Judge O'Meara's question about whether he wanted to rest his case was:

> I don't know that I have rested. I'm more than happy to continue my case, but it's impracticable and . . . I believe we have established a *prima facie* case. However, we are unable to continue because of the portions of the case that you believe cannot continue, so that's really what our position is. I don't know that translates to resting. I can only say that I'm more than happy to continue to prosecute my case within my understanding of the law and what the summary judgment ruling was.

(Pl.'s App. at 139.) Judge O'Meara said he understood Mendenhall's position. He then dismissed the jury and ended the trial.

Two days later, on February 20, 2004, Judge O'Meara issued an order entering judgment for the defendant, finding that "Defendant is entitled to a judgment of no cause of action as a matter of law." So, upon that record, we discuss the merits of this appeal.

## II. Analysis

We will first address Judge O'Meara's conclusion that Mendenhall's hostile environment claim could not survive absent an actionable race discrimination claim. We review *de novo* the district court's conclusions of law. *See Pearson v. Edgar*, 153 F.3d 397, 401 (7th Cir. 1998).

Mendenhall argues that under the law of the case doctrine, Judge O'Meara should not have been permitted to alter the previous ruling by Judge Kocoras who found that material issues of fact remained relating to the hostile work environment claim and the retaliation claim. In situations where a different member of the same court re-examines a prior ruling, "the law of the case doctrine . . . reflects the rightful expectation of litigants that a change of judges midway through a case will not mean going back to square one." *Best v. Shell Oil Co.*, 107 F.3d 544, 546 (7th Cir. 1997). The second judge may alter previous rulings in certain circumstances, but "he is not free to do so . . . merely because he has a different view of the law or the facts from the first judge." *Id.* (quoting *Williams v. C.I.R.*, 1 F.3d 502, 503 (7th Cir. 1993)). So, "the presumption is that earlier rulings will stand, even though it can be overcome for compelling reasons (such as new controlling law or clear error)." *Best*, 107 F.3d at 546.

"When the workplace is permeated with discriminatory

intimidation, ridicule, and insult, that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment, Title VII is violated." *Harris v. Forklift Sys. Inc.*, 510 U.S. 17, 21 (1993) (internal quotations and citations omitted). An actionable hostile environment claim requires the plaintiff to prove: (1) that the work environment was both subjectively and objectively offensive; (2) that the harassment was based on membership in a protected class; (3) that the conduct was severe or pervasive; and (4) that there is a basis for employer liability. *See Cerros v. Steel Techs., Inc.*, 288 F.3d 1040, 1045 (7th Cir. 2002) (citing *Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742, 754 (1998)). Factors that may be considered in deciding whether the environment is hostile or abusive "may include the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Harris*, 510 U.S. at 23.

Judge O'Meara neither cited any new controlling law nor demonstrated that the previous ruling was clear error when he altered Judge Kocoras's ruling. In fact, we can find no caselaw supporting Judge O'Meara's ruling that a valid race discrimination claim is a prerequisite for a hostile environment claim. His ruling was incorrect as a matter of law in this circuit and Mueller conceded as much at oral argument.

Because the challenged ruling is on an issue of law, "the question is not whether the second judge should have deferred to the ruling of the first judge, but whether that ruling was correct. If it was, the ruling of the second judge was incorrect, whether or not he even had the power to make it[.]" *Williams*, 1 F.3d at 503. Judge O'Meara's ruling was wrong. Mendenhall should have the opportunity to present his hostile environment claim to a jury.

In order to decide whether to remand the retaliation claim, we must determine whether Mendenhall rested his case. If he did rest his case, and had not yet established the *prima facie* case (as Judge O'Meara found), we will be required to affirm the district court's decision to grant judgment as a matter of law to Mueller on the retaliation claim. If, however, we find that he did not rest his case, judgment as a matter of law was not proper regardless of whether Mendenhall's *prima facie* case had been shown before the trial ended.

Mueller argues that Judge O'Meara properly entered judgment as a matter of law on the retaliation claim because Mendenhall had "been fully heard on [the] issue and there [was] no legally sufficient evidentiary basis for a reasonable jury to find for [him] on that issue[.]" Fed. R. Civ. P. 50(a)(1). We review *de novo* the district court's entry of judgment as a matter of law. *See Murray v. Chi. Transit Auth.*, 252 F.3d 880, 886 (7th Cir. 2001).

Judge O'Meara told the parties that he was prepared to deny the relevance of any testimony relating to the graffiti and name-calling because those pieces of evidence were part of the race discrimination and hostile environment claims. By prohibiting all background evidence that Mendenhall planned to use to show that he was fired because of his complaints, Judge O'Meara made Mendenhall's retaliation claim nearly impossible to prove. Mendenhall realized this and decided his only viable course of action was to acquiesce to the ruling and preserve his right to appeal. His request for an interlocutory appeal was the next logical step.

When Judge O'Meara suggested that the case would be better positioned for appeal if Mendenhall rested his case and allowed the court to grant judgment as a matter of law in favor of Mueller, Mendenhall's counsel said that although he would be happy to continue to present his case within his understanding of the law, it was impracticable to

do so because of the limits created by Judge O'Meara's rulings. He further stated on the record, "I don't know that translates to resting." (Pl.'s App. at 139.) He did not finish presenting his evidence. In fact the only witness who had been fully examined was Jones, an adverse witness. One co-worker had been partially examined when the trial was stopped, but neither Mendenhall nor his three other witnesses had taken the stand.

Mendenhall asked the court for an interlocutory appeal and left the courtroom believing that Judge O'Meara would certify the issue for appeal under 28 U.S.C. § 1292(b). This belief was based on Judge O'Meara's statement that "I will do whatever I need to do to put you on the road to an interlocutory appeal. I'll do the district judge's job by saying I think you should be entitled to it." (Pl.'s App. at 137.) That is what § 1292(b) requires, and Mendenhall's belief that a certification would issue was certainly understandable.

Judgment as a matter of law may be granted only when a party has "been fully heard on the issue . . . ." Fed. R. Civ. P. 50(a)(2). Because Mendenhall had not fully presented his case on the retaliation issue, Judge O'Meara erred when he entered judgment against Mendenhall. We need not discuss whether Mendenhall established his *prima facie* case on the retaliation claim. That question will be answered by the jury after Mendenhall is permitted to present his case in full.

## III. Conclusion

For the reasons stated above, the order dismissing the hostile work environment claim is VACATED. The entry of judgment for the defendant on the retaliation claim is also VACATED. Both the hostile work environment and retalia-

tion claims are REMANDED to the district court for further proceedings. On remand, Circuit Rule 36 shall apply.

A true Copy:

Teste:

_____
*Clerk of the United States Court of*
*Appeals for the Seventh Circuit*