In the

# United States Court of Appeals

## For the Seventh Circuit

No. 09-3661

BRENDA CHANEY,

*Plaintiff-Appellant,*

*v.*

PLAINFIELD HEALTHCARE CENTER,

*Defendant-Appellee.*

Appeal from the United States District Court
for the Southern District of Indiana, Indianapolis Division.
No.1:08-cv-00071-SEB-DML—**Sarah Evans Barker**, *Judge*.

ARGUED APRIL 27, 2010—DECIDED JULY 20, 2010

Before ROVNER, WILLIAMS, and SYKES, *Circuit Judges*.

WILLIAMS, *Circuit Judge*. This case pits a health-care worker's right to a non-discriminatory workplace against a patient's demand for white-only health-care providers. Plainfield Healthcare Center is a nursing home that housed a resident who did not want assistance from black certified nursing assistants. Plainfield complied with this racial preference by telling Brenda Chaney, a black nursing assistant, in writing everyday

that "no black" assistants should enter this resident's room or provide her with care.

Chaney brought this action under Title VII of the 1964 Civil Rights Act. She claims that Plainfield's practice of acceding to the racial biases of its residents is illegal and created a hostile work environment. She also asserts that Plainfield fired her because she was black. The Equal Employment Opportunity Commission, as amicus, agrees, and together they urge reversal of the district court's grant of summary judgment to Plainfield. Because the racial preference policy violates Title VII by creating a hostile work environment and because issues of fact remain over whether race motivated the discharge, we reverse the district court's order.

## I. BACKGROUND

Since Plainfield Healthcare Center ("Plainfield") prevailed on summary judgment, we recount the facts in the light most favorable to Brenda Chaney, the non-movant. Plainfield hired Chaney as a nurse aide or certified nursing assistant ("CNA"). As a CNA, she was responsible for monitoring patients, responding to their requests for service, and generally assisting with their daily living needs. Plainfield detailed Chaney's daily shift duties on an assignment sheet that she and other employees received upon arriving at work. The assignment sheet listed the residents in Chaney's unit and their corresponding care needs. It also featured a column with miscellaneous notes about each resident's condition. In the case of Marjorie Latshaw, a resident in Chaney's

unit, the sheet instructed nurse aides that Latshaw "Prefers No Black CNAs."

Plainfield acknowledges its policy of honoring the racial preferences of its residents in assigning health-care providers. Plainfield maintains it expected its employees to respect these racial preferences because it otherwise risked violating state and federal laws that grant residents the rights to choose providers, to privacy, and to bodily autonomy. Indeed, in its reply brief to the district court on summary judgment, Plainfield acknowledged that the assignment sheet for Chaney "banned" her from assisting Latshaw.

For fear of being fired, Chaney went along with the policy. Although Latshaw remained on her assignment sheet, Chaney reluctantly refrained from assisting her, even when she was in the best position to respond. Once, Chaney found Latshaw on the ground, too weak to stand. Despite wanting badly to help, Chaney had to search the building for a white CNA. Plainfield housed at least two other residents with a similar distaste for black CNAs. One refused Chaney's assistance in the shower, asking for a different nurse aide instead. On a separate occasion, a co-worker warned Chaney that another resident does not care for blacks. Emotionally, these race-based limitations depressed Chaney, who routinely left work "teary eyed."

Plainfield's practice of honoring the racial preferences of residents was accompanied by racially-tinged comments and epithets from co-workers. For instance, in the presence of a resident, a white nurse aide named Audria

called Chaney a "black bitch." Another time, a white co-worker looked directly at Chaney and asked why Plainfield ". . . keep[s] on hiring all of these black niggers? They're not gonna stay anyway." The epithets were reported to the unit supervisor, Loretta Askew, who promised to address them. Although the epithets ceased, co-worker Audria continued to remind Chaney that certain residents were off limits because she was black. Chaney reported these comments to Askew, who renewed her promise to take care of it. Audria eventually left Chaney alone, but Plainfield's racial preference policy remained in place and continued to surface in conversations with other employees.

After Chaney had worked at Plainfield for just three months, Plainfield fired her. In the early morning on September 6, 2006, according to Nurse Cafouras who lodged the complaint that led to Chaney's discharge, a resident struggling to get out of bed had signaled a call light. Chaney and another CNA, C.J. Hart, were both positioned to respond but both initially refused. When Chaney ultimately came to the resident's room, Cafouras alleged that Chaney used profanity while lifting the resident onto her bedside commode—"she's shitting," Chaney supposedly said.

Cafouras's complaint was investigated concurrently by Askew, who normally investigated misconduct complaints in her unit, and John Reyes, the Director of Nursing. Askew was skeptical of the allegation, having never before heard Chaney use profanity at work. She investigated and learned that the resident's roommate,

a witness to the incident, did not hear Chaney use profanity. The record is silent as to whether the resident who signaled the call light heard Chaney use profanity. Askew relayed her findings, along with her skepticism, to Reyes. Although a full day had yet to pass since Cafouras filed her complaint, Reyes had resolved to fire Chaney. Hart, who heard the alarm but never responded, was not interviewed until two weeks after the incident. Hart was not disciplined even though the resident who signaled the alarm was in her unit, not Chaney's.

On the evening of September 6, 2006, Chaney was sent home when she arrived to work her regular night shift. The next morning, she received a short phone call from Plainfield's human resources manager, Donna Gray, informing her that she was terminated. At a post-termination meeting a few days later, Chaney alleges that Plainfield told Chaney that it fired her because she said the word "shitting" in the presence of a resident, and gave no other grounds for the firing. At this meeting, Chaney denied the charge and was invited to write her version of the events, but her termination was not overturned. Plainfield has since focused on other, independent grounds for her discharge: "bed alarm and call light infractions" and "not doing a shift change."

The district court entered summary judgment in favor of Plainfield on the claims of hostile workplace and discriminatory discharge. Although the court recognized that the comments from Chaney's co-workers had created a hostile work environment, it concluded that Plainfield avoided liability by responding promptly each time it

received a complaint. Treating the racial preference policy as a separate claim of a hostile work environment, the court concluded that the note on Chaney's assignment sheet advising her of the "Prefers No Black CNAs" exclusion was reasonable given Plainfield's good-faith belief that ignoring the resident's preferences would have violated Indiana's patient-rights laws. As for Chaney's discriminatory-discharge claim, the court concluded that Chaney had failed to produce evidence from which an inference could be drawn that racial animus motivated Reyes's decision to fire her.

## II. ANALYSIS

On appeal, Chaney and the EEOC argue that Plainfield's policy of acceding to the racial biases of its residents is an unlawful employment practice that, along with racial animosity from her co-workers, created an unremediated, racially hostile workplace. They also contend that she presented sufficient evidence to create a triable question of whether racial animus motivated her firing. We review the grant of summary judgment de novo, with the familiar standard that summary judgment should be granted if there is no genuine issue of material fact and the record shows that the law entitles the moving party to judgment. *Chaklos v. Stevens*, 560 F.3d 705, 710 (7th Cir. 2009).

### A. Racially Hostile Workplace Claim

Title VII prohibits employers from discriminating against any individual "with respect to his compensation, terms,

conditions, or privileges of employment, because of such individual's race. . . ." 42 U.S.C. § 2000e-2(a)(1). In order to impose Title VII liability for a racially hostile workplace, a plaintiff must show: (1) the work environment was both subjectively and objectively offensive; (2) that the harassment was based on membership in a protected class; (3) that the conduct was severe or pervasive; and (4) that there is a basis for employer liability. *Mendenhall v. Mueller Streamline Co.*, 419 F.3d 686, 691 (7th Cir. 2005) (citations omitted).

We have no trouble finding that a reasonable person would find Plainfield's work environment hostile or abusive. In *Oncale v. Sundowner Offshore Services, Inc.*, the Supreme Court emphasized the importance of considering the entire context of the workplace. 523 U.S. 75, 81 (1998). Here, over the course of three months, co-workers called Chaney a "black bitch" and a "nigger" on multiple occasions. *Cf., Rodgers v. Western-Southern Life Ins. Co.*, 12 F.3d 668, 675 (7th Cir. 1993) ("Perhaps no single act can more quickly alter the conditions of employment and create an abusive working environment than the use of an unambiguously racial epithet such as "nigger" by a supervisor in the presence of his subordinates.") (citations omitted). And in her deposition, Chaney alleges that more subtle racial slights and comments continued even after management was notified of the problem. Most importantly, Plainfield acted to foster and engender a racially-charged environment through its assignment sheet that unambiguously, and daily, reminded Chaney and her co-workers that certain residents preferred no black CNAs. Unlike white aides,

Chaney was restricted in the rooms she could enter, the care that she could provide, and the patients she could assist.[1]

Plainfield argues there is no basis for employer liability because its response to the racial epithets was adequate in stopping the harassment and that any subsequent comments were mere reminders of a particular resident's preference and not racially offensive. While it is true that Plainfield's actions stopped the use of the most vulgar racial epithets, we cannot agree that any further comments to Chaney about patients' racial preferences were innocent and objectively unoffensive. Nor can we agree that Plainfield's policy of acceding to patient preference, and expecting Chaney to adhere to its instructions, was reasonable. Plainfield claims this policy was necessary to comply with state and federal law.

It is now widely accepted that a company's desire to cater to the perceived racial preferences of its customers

---

[1] At oral argument, counsel for Plainfield denied that Plainfield prohibited Chaney from treating Latshaw. "The chart does not say," he explained, "Brenda Chaney, you can never treat this patient." Counsel's pro-defendant interpretation of the evidence violates the rules of inference on its motion for summary judgment, and flatly contradicts Plainfield's earlier judicial admission in its reply brief on summary judgment, where Plainfield maintained that "Chaney was not banned from doing her job, only from attending to Marjorie Latshaw." Dkt. 35 at 8. And counsel's statement also contradicts Plainfield's brief on appeal, where it similarly told us that Chaney had to keep away from Latshaw so that Plainfield could comply with federal and state law.

is not a defense under Title VII for treating employees differently based on race. *See, e.g.*, *Johnson v. Zema Sys. Corp.*, 170 F.3d 734, 744 (7th Cir. 1999) (evidence of segregated sales force supported Title VII claim); *Ferrill v. The Parker Group, Inc.*, 168 F.3d 468, 477 (11th Cir. 1999) (employer's practice of assigning "get-out-the-vote" phone calls based on race violated Title VII); *see also Fernandez v. Wynn Co.*, 653 F.2d 1273, 1276-77 (9th Cir. 1981) (rejecting customer preference defense in sex discrimination context and relying on EEOC holding that Title VII does not permit the accommodation of the racially discriminatory policies of foreign nations ). Plainfield argues that this well-settled reading of Title VII does not apply—or should not apply—in the long-term care setting. It contends that long-term care facilities have obligations to their clients that place them in a different position from most employers. Plainfield is both a medical provider and a permanent home for hundreds of residents. The rights of those residents are secured by federal and state laws and a vast network of regulations that, according to Plainfield, it must honor before considering its Title VII obligations to its employees.

For support, Plainfield cites a line of Title VII cases permitting sex discrimination in the health-care setting. *See Jennings v. N.Y. State Office of Mental Health*, 786 F.Supp. 376, 383 (S.D.N.Y. 1992); *Local 567 Am. Fed'n of State, County, and Mun. Employees v. Michigan*, 635 F.Supp. 1010, 1013 (E.D. Mich. 1986); *Backus v. Baptist Med. Ctr.*, 510 F. Supp. 1191, 1193 (E.D. Ark. 1981); *Fesel v. Masonic Home of Del., Inc.*, 447 F.Supp. 1346 (D. Del. 1978) (*aff'd by* 591 F.2d 1134 (3d Cir. 1979)). Taken together, they hold

that gender may be a legitimate criterion—a bona fide occupational qualification ("BFOQ")—for accommodating patients' privacy interests. It does not follow, however, that patients' privacy interests excuse disparate treatment based on race. Title VII forbids employers from using race as a BFOQ, *Rucker v. Higher Educ. Aids Bd.*, 669 F.2d 1179, (7th Cir. 1982), and Plainfield's cases allowing gender preferences in the health-care setting illustrate why. The privacy interest that is offended when one undresses in front of a doctor or nurse of the opposite sex does not apply to race. Just as the law tolerates same-sex restrooms or same-sex dressing rooms, but not white-only rooms, to accommodate privacy needs, Title VII allows an employer to respect a preference for same-sex heath providers, but not same-race providers.

Plainfield argues that even if Title VII does not expressly contemplate a patient-preference defense to race-based work assignments, Plainfield's policy is a reasonable and good-faith effort to comply with Indiana law and should be excused on that basis. Under Indiana regulations governing long-term care facilities, residents have a right to "choose a personal attending physician and other providers of services." 410 IND. ADMIN. CODE 16.2-3.1-3(n)(1). If Plainfield's reading of the regulation (requiring it to instruct its employees to honor a patient's racial preferences) were correct, it would conflict with Title VII. When two laws conflict, one state, one federal, the Supremacy Clause dictates that the federal law prevails. U.S. CONST. art. VI, cl. 2; *Crosby v. Nat'l Foreign Trade Council*, 530 U.S. 363, 372 (2000). Had a resident sued Plainfield under the patient's rights provision, Title

VII would have supplied an affirmative defense. *See Howlett v. Rose*, 496 U.S. 356, 371-72 (1990); *see also Grann v. City of Madison*, 738 F.2d 786, 792 (7th Cir. 1984). Title VII does not, by contrast, contain a good-faith "defense" that allows an employer to ignore the statute in favor of conflicting state law.

In any event, Indiana's regulations do not require Plainfield to instruct its employees to accede to the racial preferences of its residents. The regulations merely require Plainfield to allow residents access to health-care providers of their choice. 410 IND. ADMIN. CODE 16.2-3.1-3(n)(1). If a racially-biased resident wishes to employ at her own expense a white aide, Indiana law may require Plainfield to allow the resident reasonable access to that aide. But the regulations do not say that a patient's preference for white aides that *Plainfield* employs trumps Plainfield's duty to its employees to abstain from race-based work assignments.

Plainfield's reading of Indiana regulations is also untenable because it puts Plainfield at risk of violating duties of medical care that it owes its residents. A potential violation could have occurred when Chaney, adhering to Plainfield's policy, reluctantly left Latshaw on the floor so she could search the building for a white nurse aide rather than immediately attend to her needs. Plainfield's claim of "good-faith" appears less than compelling as a factual matter as well. If Plainfield was worried that dishonoring race-based work preferences risked violating Indiana's regulations, it could have asked Indiana's State Department of Health whether state law

required Plainfield to direct its employees to cater to its residents' racial preferences. The record does not show an attempt to seek such guidance.

Plainfield's next argument that the racial preference policy was required under federal law is also not persuasive. Plainfield relies primarily on three sections of the Medicare Act. The first, 42 U.S.C. § 1395, states that "Nothing in this subchapter" shall interfere with the practice of medicine. "[T]his subchapter" refers to the Medicare Act, not, as Plainfield suggests, the federal employment-rights law. Similarly off the mark is Plainfield's reliance on 42 U.S.C. § 1395a. That provision merely reminds Medicare beneficiaries that federal law does not preclude them from using providers that have opted out of Medicare. Finally, Plainfield relies on 42 U.S.C. § 1395i, which provides that Medicare beneficiaries in long-term care facilities have a right to choose "a personal attending physician." The law is silent about a beneficiary's right to choose *other* service providers, such as CNAs. Moreover, as with the Indiana regulation, even if the law extended to other service providers, it would merely require Plainfield to allow residents access to them, rather than obligate Plainfield to institute race-based work practices.

Plainfield also defends the racial preference policy on a practical level: without it, Plainfield risks exposing black employees to racial harassment from the residents and, in turn, exposing itself to hostile workplace liability. It adds, without providing authority, that discharging a racially hostile resident to avoid exposing employees

to the resident is illegal. But without resorting to discharging residents, a long-term care facility confronted with a hostile resident has a range of options. It can warn residents before admitting them of the facility's non-discrimination policy, securing the resident's consent in writing; it can attempt to reform the resident's behavior after admission; and it can assign staff based on race-neutral criteria that minimize the risk of conflict. *See* Patrick Gavin & JoAnne Lax, *When Residents and Family Harass Staff: The Tightrope between Regulatory Compliance, Risk Management and Employment Liability*, LONG TERM CARE AND THE LAW 16-18 (Feb. 27, 2008) (American Health Lawyers Association, Seminar Materials). Plainfield could have, for instance, advised its employees that they could ask for protection from racially harassing residents. That way, Plainfield would not be imposing an unwanted, race-conscious work limitation on its black employees; rather, it would be allowing all employees to work in a race-neutral, non-harassing work environment, as is commonly expected of employers. *Cf. Porter v. Erie Foods Int'l, Inc.*, 576 F.3d 629, 636 (7th Cir. 2009); *Herron v. DaimlerChrysler Corp.*, 388 F.3d 293, 302 (7th Cir. 2005). And even if all these efforts do not guarantee full racial harmony, they exemplify reasonable measures that an employer can undertake to avoid liability for known workplace harassment. *See, e.g., Cooper-Shut v. Visteon Automotive Sys.*, 361 F.3d 421, 426 (7th Cir. 2004).

Plainfield, however, chose none of these options. Instead, Plainfield told Chaney that it was excluding her from work areas and residents solely on account of her race,

thereby creating a racially-charged workplace that poisoned the work environment. In less than three months, Chaney reported at least three specific incidents of harassment, two of which (i.e., "Black bitch" and "why do they keep hiring these black niggers?") involved racial slurs directed toward her. Although the direct epithets stopped after Plainfield learned of them, the record does not show whether the lulls in harassment were fortuitous or the result of remedial action. *See Smith v. Shehan*, 189 F.3d 529, 535 (7th Cir. 1999). More fundamentally, Plainfield never corrected the principle source of the racial hostility in the workplace—its willingness to accede to a patient's racial preferences. The hostility that Chaney described came from daily reminders that Plainfield was employing her on materially different terms than her white co-workers. Fueling this pattern was the racial preference policy, both a source of humiliation for Chaney and fodder for her co-workers, who invoked it regularly. It was, in short, a racially hostile environment, and the evidence presented at summary judgment allows a jury to conclude that Plainfield took insufficient measures to address it.

## B.  Discriminatory Discharge Claim

Chaney renews her argument that her discharge was racially motivated. She proceeds under the direct method of proof, which may include direct or circumstantial evidence that race motivated Plainfield's decision. *See Henry v. Jones*, 507 F.3d 558, 566 (7th Cir. 2007). The thrust of Chaney's claim is that Reyes's cursory investigation

into her alleged misconduct casts doubt on the sincerity of the reason that he offered for firing her. Evidence of pretext, by itself, may not always be enough to defeat summary judgment under the direct method. *See Venturelli v. Arc Cmty. Serv.*, 350 F.3d 592, 601 (7th Cir. 2002). But Chaney has also presented other circumstantial evidence of more favorable treatment of a similarly situated co-worker suggesting that race figured into Plainfield's decision to fire her. Taken together, the two threads of evidence create a triable issue whether race motivated Chaney's discharge.

First, the record contains evidence that Plainfield's grounds for firing her were insincere. Reyes had resolved to fire Chaney within 24 hours of receiving Cafouras's complaint, a decision he reached in an unusual way. Askew ordinarily investigated charges of misconduct in her unit, but Reyes conducted his own investigation and decided to fire Chaney without considering Askew's evidence that the complaint was unfounded. Reyes could have easily interviewed Chaney about the incident, as well as co-worker Hart, who was present when Chaney's alleged misconduct occurred. What is more, Chaney states that at the termination meeting, the only reason she was given for her discharge was the alleged use of profanity. During litigation however, Plainfield has focused attention on other potential grounds for firing Chaney such as charges of ignoring the call light and refusing a shift change. A shifting justification for an employment action can itself be circumstantial evidence of an unlawful motive. *See Rudin v. Lincoln Land Cmty. Coll.*, 420 F.3d 712, 723-24 (7th Cir. 2005). Plainfield

counters that Reyes's decision to fire Chaney should be afforded a "presumption of legitimacy" since he was the official that hired her. This argument was forfeited because Plainfield made it only on appeal. *See Arendt v. Vetta Sports, Inc.*, 99 F.3d 231, 237 (7th Cir. 1996). In any case, the "presumption" is just part of the evidentiary mix. *Herrnreiter v. Chi. Hous. Auth.*, 315 F.3d742, 747 (7th Cir. 2002).

Chaney has also presented circumstantial evidence of a disparity in treatment between her and a comparable white nurse aide. Evidence that similarly situated employees outside the protected class received better treatment can help support a circumstantial showing of discrimination. *See Henry*, 507 F.3d at 566. Her first comparable white CNA is Audria, who like Chaney was reported for swearing in the presence of a resident. This comparison would be apt if Chaney had evidence that the complaint went higher up the chain of command than Askew, her immediate supervisor. Since she does not, the comparison is unhelpful, as the decision to discharge Chaney belonged to Reyes, not Askew.

Chaney has a more promising comparator in Hart, the CNA whose patient Chaney was assisting when she allegedly used profanity. Both Chaney and Hart were at the nurse station when Cafouras asked for help. The resident who needed help was in Hart's unit, yet it was Chaney, not Hart, who ultimately responded to the call. True, unlike Chaney, Hart was not accused of using profanity in front of a resident. But the similarly situated co-worker inquiry is a search for a substantially similar

employee, not for a clone. *Argyropolous v. City of Alton*, 539 F.3d 724, 735 (7th Cir. 2008). If, as Plainfield now contends, failing to respond to a bed alarm is a separate, terminable offense, it is suspicious that Hart was not questioned about her inaction until two weeks after the incident and that, despite her refusal to respond to the call light from a resident in her unit, she got off without so much as a warning. When considered in light of the full account of Reyes's unusual and limited investigation, a reasonable jury could conclude from this record that Plainfield's grounds for firing Chaney cloaked the forbidden motivation of race.

## III.  CONCLUSION

The judgment of the district court is REVERSED and REMANDED for further proceedings.