In the

# United States Court of Appeals
## For the Seventh Circuit

———————————

Nos. 16-2788 and 16-2839

ANDY MOHR TRUCK CENTER, INC.,

*Plaintiff-Appellee, Cross-Appellant*,

*v.*

VOLVO TRUCKS NORTH AMERICA, a division of Volvo Group North America, LLC.,

*Defendant-Appellant, Cross-Appellee.*

———————————

Appeals from the United States District Court for the
Southern District of Indiana, Indianapolis Division.
No. 1:12-cv-00448 — **William T. Lawrence**, *Judge*.

———————————

ARGUED APRIL 5, 2017 — DECIDED AUGUST 28, 2017

———————————

Before WOOD, *Chief Judge*, and FLAUM and HAMILTON, *Circuit Judges*.

WOOD, *Chief Judge*. Volvo Trucks makes heavy-duty trucks, and Andy Mohr Truck Center was one of its dealers. The dealership agreement governing their business dealings was negotiated and concluded in early 2010. Relations between them, unfortunately, soured quickly. Before too long, Volvo and Mohr were suing one another in separate federal

lawsuits, which were consolidated later in the district court. When all was said and done, Mohr won a verdict of $6.5 million, and it prevailed on Volvo's claim that it breached a commitment to build a new facility. Volvo staved off Mohr's claim against it based on Volvo's failure to award Mohr a Mack Truck franchise. We now have before us Volvo's appeal and Mohr's cross-appeal, but before we delve into the merits, we turn to some of the nuances of heavy-duty truck sales.

**I**

In the United States, federal agencies classify trucks with a gross weight of more than 33,001 pounds as class 8, heavy-duty trucks. See Greenhouse Gas Emissions Standards and Fuel Efficiency Standards for Medium- and Heavy-Duty Engines and Vehicles, 76 Fed. Reg. 57,106, 57,114–15 (Sept. 15, 2011). The American heavy-duty truck sector "spans a wide range of vehicles" with "unique form[s] and function[s]," including the tractor-trailer semis familiar to many drivers. *Id.* at 57,114. Class 8 trucks are primarily used for freight transportation over long distances. *Id.* at 57,115.

Unlike passenger cars, most class 8 trucks are specially ordered based on customers' business requirements and specifications. When a customer wants to order a truck or a fleet of trucks, she generally approaches one or more dealers with her specifications to get a price quote. The dealer then communicates with the manufacturer in order to negotiate a price at which the manufacturer is willing to sell the truck(s) to the dealer. Based upon this price, the dealer is able to set the price at which it will offer to sell the truck(s) to the customer. In other words, for each sale, the dealer must negotiate two separate transactions—an upstream deal with the manufacturer and a downstream deal with the customer.

During the time at issue in this case, Volvo maintained list prices for various models of trucks with various options. But Volvo also offered all its dealers a standard concession (*i.e.*, a percentage discount off the net price), which varied slightly by truck model. On top of this, Volvo operated a program called Retail Sales Assistance (RSA), through which dealers could submit requests for additional concessions. To participate in the RSA program, dealers submitted two-page request forms detailing relevant information about each customer's potential order: the model, cab, engine, and transmission types; the quantity of trucks; and the competition (other offers or truck types a customer was considering). Volvo evaluated these requests on a case-by-case basis and awarded concessions based on a variety of factors, including the price offered by other manufacturers, the quantity of trucks requested, the truck specifications, Volvo's production capacity, and the customer's purchase history. According to Volvo, where two of its dealers were bidding for the same transaction (*i.e.*, the same customer, date, and specifications), Volvo offered each dealer the exact same concession. Based on the concession offered by Volvo to the dealer, the dealer could then negotiate a price quote with the customer.

Although Volvo and its dealers share a common interest in making the sale, their interests diverge—at least potentially—when it comes to the share of profit each one receives from a given sale. For any final price to the customer, one component represents Volvo's share, and the other the dealer's share. The lower the concession Volvo gives to the dealer, the greater its share of that final price (if we assume that the price to the final customer is driven by market supply and demand). The higher the concession—*i.e.* the more the dealer reaps for its services—the greater the dealer's profit

from the sale, at Volvo's expense. These competing motivations can cause discord.

**II**

The legal rough patch between Mohr and Volvo began in April 2012, when Volvo sought a declaratory judgment that it was entitled to terminate Mohr's dealership agreement because Mohr had misrepresented a material fact in connection with its dealer application. During the course of the negotiations, Mohr supposedly had promised Volvo that it would build a new long-term facility for the dealership if Volvo awarded the contract to Mohr. After the agreement was final, however, Mohr failed to make good on that promise. We refer to this as the "new-facility claim." Mohr had its own beef: it complained that Volvo had violated the Indiana Franchise Disclosure Act, Ind. Code 23-2-2.5 (IFDA), and the Indiana Deceptive Franchise Practices Act (IDFPA), Ind. Code 23-2-2.7. This violation stemmed from a promise Volvo allegedly made to award Mohr a Mack Truck dealership franchise—something within Volvo's power because Mack Truck is part of the Volvo Group. See Mack Trucks, *About Mack*, https://www.macktrucks.com/about-mack/ (last visited Aug. 28, 2017). The Mack line would have justified Mohr's investment in the new facility, and this promise (Mohr said) induced it to enter into the Volvo dealer agreement. But Volvo gave the Mack franchise to another company. We refer to this as the "Mack claim." Finally, Mohr accused Volvo of providing more favorable concessions on truck pricing to other franchise dealerships through its RSA program than it gave to Mohr. Mohr contended that this violated a provision of the IDFPA that prohibits a franchisor from

"[d]iscriminating unfairly among its franchisees … ." Ind.
Code § 23-2-2.7-2(5).

The district court consolidated the two actions, and the
case dragged on for over three years. During that time, the
district court granted summary judgment for Mohr on Volvo's
declaratory judgment claim, holding that the integration
clause in the dealer agreement barred the new-facility claim.
On the negative side for Mohr, the same integration clause
doomed its Mack claim. The district court allowed Mohr's
claim for unfair discrimination under the IDFPA to move for-
ward. It held a trial in which the jury ruled for Mohr and
awarded it $6.5 million. Volvo then moved for judgment as a
matter of law under Federal Rule of Civil Procedure 50(b), but
the district court denied the motion. Mohr's appeal and
Volvo's cross-appeal followed.

## III

We turn first to Volvo's challenge to the district court's
denial of its Rule 50(b) motion for judgment as a matter of law
on Mohr's claim of discrimination under the IDFPA. We give
*de novo* consideration to this decision, taking the evidence in
the light most favorable to the non-moving party. *Baugh v.
Cuprum S.A. de C.V.*, 845 F.3d 838, 848 (7th Cir. 2017). The jury
concluded that Volvo had discriminated unfairly against
Mohr, in violation of Indiana law. We will reverse only if no
rational jury could have found in Mohr's favor. *Id.* at 848–49.

At trial, Mohr presented evidence of 13 transactions that
formed the basis of the jury's finding that Volvo had discrim-
inated against Mohr with respect to price concessions. One
instance would be enough to sustain the finding of liability,
though a greater number would affect damages. For each of

the 13 transactions in question, Mohr compared the conces-
sion it received from Volvo with the concessions that Volvo
awarded to other franchisee-dealers in various states, each of
which had the same terms in their dealer agreements and the
same access to the RSA process. The quotes in question were
for the same model and year of truck, and for a quantity of
more than ten trucks. Each of the concession quotes was lim-
ited to comparisons within a three-month window. Mohr pre-
pared exhibits for the jury that showed that Mohr received
less favorable quotes for concessions than at least some of the
comparators did for each deal. Mohr's industry expert testi-
fied that he had reviewed all of the RSA data and comparator
transactions, and that Volvo had no process to compare price
concessions and made no effort to equalize them. Mohr's sales
manager also testified about receiving less favorable price
concessions on large fleet transactions. He asserted that Mohr
would have made certain sales if it had been given more fa-
vorable concessions.

Volvo offers three reasons why no rational jury could have
found that it discriminated unfairly against Mohr: first, that
the evidence did not support an inference of unfair discrimi-
nation; second, that the evidence was insufficient to demon-
strate causation; and third, that the limitation of remedies pro-
vision in the dealer agreement precluded Mohr's claim for
damages. We agree with Volvo on its first point, and so we
have no need to address causation or remedies.

Volvo supports its evidentiary challenge to the inference
of discrimination with three sub-arguments: (1) that the com-
parators were not similarly situated in the relevant respects;
(2) that the data that purported to show the discrimination
was "cherry-picked"; and (3) that the IDFPA applies only

within the state of Indiana, and only to discrimination among Indiana dealers. Mohr defends the jury's verdict on each of these points: it says the comparators were similar; the cherry-picking argument was untimely; and the extraterritorial point was waived and in any event lacks merit.

There is a dearth of Indiana precedent that might shed light on the meaning of discrimination for purposes of the IDFPA. As best we can tell, Indiana's courts have not clarified what is meant by "unfair discrimination" in the statute, nor what would be sufficient to make such a showing. At various times, the parties and district court refer to the claim in question as one of "price discrimination" under the statute. That is not helpful. Price discrimination is both an economic concept that refers to the ability to charge each customer the price that reflects that customer's demand, and a legal concept that appears in the Robinson-Patman Act, 15 U.S.C. § 13. The Robinson-Patman Act makes it unlawful to charge different prices to different purchasers of like commodities, unless one of the statutory defenses applies (such as meeting competition or cost justification). 15 U.S.C. § 13(a). Because the purpose of Robinson-Patman is ostensibly to promote competition, it does not ban all price differences charged to different purchasers of similar commodities; it reaches only those that threaten to injure competition. *Volvo Trucks N. Am., Inc. v. Reeder-Simco GMC, Inc.*, 546 U.S. 164, 176–77 (2006).

Indiana's statute, on the other hand, is not concerned with competition at all. Rather, it is intended to protect franchisees. It prohibits coercive, fraudulent, and deceptive behavior toward franchisees, and limits the types of clauses that may be included in the franchise agreements. See Ind. Code 23-2-2.7.

The statute makes it unlawful for a franchisor who has entered into an agreement with a franchisee who resides or operates in Indiana to engage in certain acts and practices "in relation to the agreement." *Id.* § 2. For our purposes, the relevant practice is "[d]iscriminating unfairly among its franchisees or unreasonably failing or refusing to comply with any terms of a franchise agreement." *Id.* § 2(5).

Although no reported Indiana case elucidates what Mohr needed to establish in order successfully to maintain a claim of unfair discrimination, we have held that "[d]iscrimination among franchisees means that as between two or more similarly situated franchisees, and under similar financial and marketing conditions, a franchisor engaged in less favorable treatment toward the discriminatee than toward other franchisees." *Canada Dry Corp. v. Nehi Beverage Co., Inc. of Indianapolis*, 723 F.2d 512, 521 (7th Cir. 1983). In order to prove discrimination, plaintiffs must therefore make a showing of "arbitrary disparate treatment among similarly situated individuals or entities." *Id.* That approach still strikes us as a good reflection of the law, and so we will continue to follow it.

As this background suggests, we should begin with the question whether the comparators were similarly situated. This usually is a question of fact for the jury, assuming that the plaintiff has produced enough evidence to reach trial and survive judgment as a matter of law. *Coleman v. Donahoe*, 667 F.3d 835, 846–47 (7th Cir. 2012). In other contexts, such as Title VII, we have said that precise equivalence is not required; the parties must be comparable, not clones. *Chaney v. Plainfield Healthcare Ctr.*, 612 F.3d 908, 916 (7th Cir. 2010). "So long as the distinctions between the plaintiff and the proposed comparators are not 'so significant that they render the

comparison effectively useless,' the similarly-situated re-
quirement is satisfied." *Coleman*, 667 F.3d at 846 (citation omit-
ted).

In *Canada Dry*, we reversed a jury verdict where a franchi-
see had "introduced no evidence of more favorable treatment
of *similar* bottlers under *similar* marketing conditions" with
regard to the bases for its claim under the IDFPA. 723 F.2d at
521–22 (emphases in original). Here, in contrast, Mohr pre-
sented at least some evidence of comparable entities, includ-
ing evidence that other franchisees operated under the same
sales and marketing policies; comparator transactions for the
same truck model existed; the market for large "fleet transac-
tions" was national; and the franchisees operated under
nearly identical form dealer agreements. While Volvo argues
that there were a host of other relevant competitive circum-
stances, such as differences among the initial concession re-
quests, the question of how much weight to put on these dif-
ferences was properly reserved for the jury. We have no rea-
son to upset its determination.

The question whether the 13 transactions in question re-
vealed that Volvo was "discriminating unfairly" for purposes
of the IDFPA gives us more cause for concern. Volvo argues
that the transactions in which Mohr received a worse conces-
sion were "cherry-picked" from data that—because of the na-
ture of the RSA program—could have been manipulated to
show almost any conclusion. Volvo contends, for example,
that the underlying data showed that Mohr received an equal
or greater percentage concession than 79% of the compara-
tors. More fundamentally, Volvo argues that mere variations
in dealings between franchisors and franchisees do not neces-
sarily show unfair discrimination.

Mohr begins with a procedural riposte: Volvo waived this argument, it says, by presenting it for the first time in a Rule 50(b) renewed motion for judgment as a matter of law. See FED. R. CIV. P. 50(b). Ordinarily, a party seeking a pre-verdict judgment as a matter of law must spell out the basis on which that judgment might be rendered. *Wallace v. McGlothan*, 606 F.3d 410, 418 (7th Cir. 2010) (quoting FED. R. CIV. P. 50(a)(2) committee note (1991 amend.)). If the court denies the Rule 50(a) motion, that party may renew its earlier motion under Rule 50(b), but it may raise only the grounds it advanced in the pre-verdict 50(a) motion. *Id.* (citing FED. R. CIV. P. 50(b) committee note (2006 amend.)). "Thus, if a party raises a new argument in its Rule 50(b) motion that was not presented in the Rule 50(a) motion, the non-moving party can properly object." *Id*.

In its response to Volvo's Rule 50(b) motion, Mohr objected to Volvo's inclusion of the "cherry-picking" argument. The district court, however, understood Volvo as merely advancing a new argument in support of a ground that appeared in its original 50(a) motion: that the evidence was insufficient. The court reached the merits of that argument when it denied Volvo's 50(b) motion, noting that Volvo's reliance on *Reeder-Simco*, a Robinson-Patman case, was misplaced because (as we have said) that statute is concerned with price discrimination that results in competitive injury, not with unfair discrimination among franchisees.

It is true that the thrust of Volvo's 50(a) and 50(b) motions was slightly different. Volvo's 50(a) motion focused on the sufficiency of the evidence to show unfair discrimination based on the similarities (or lack thereof) between the transactions, whereas the 50(b) motion also attacked the sufficiency of the

evidence as "cherry-picked" and too easily manipulated to show discrimination. But these all add up to the same thing: Volvo's contention that Mohr's evidence (the 13 transactions in question) was a legally insufficient basis upon which to infer discrimination under the IDFPA. The district court reasonably found that Volvo was not trying to slip a new point into the case at that late hour.

On the merits, Mohr argues that the IDFPA did not require it to show that it was treated less favorably than all other similarly situated franchisees, nor that it received worse concessions on average. Mohr points out that its industry expert testified that he reviewed all of the RSA data and comparator transactions, and that Volvo had no process to compare price concessions and made no effort to equalize them. Mohr also notes that Mohr's sales manager testified that Mohr was receiving less favorable prices concessions on large fleet transactions.

At its heart, this disagreement is about what it takes to "discriminate unfairly" as the IDFPA uses the term. Is every instance of arbitrary and less favorable treatment unfairly discriminatory? Or must individual instances demonstrate a pattern? Has a manufacturer such as Volvo violated the law vis à vis *someone* every time a price varies by as much as a penny? Under Mohr's theory, every instance in which it received a concession that did not match the best concession on a similar transaction would show discrimination. Under Volvo's approach, the only time a single transaction could be branded as discriminatory is if Volvo provided different concessions based on precisely the same customer specifications (*i.e.*, one in which a customer was shopping around for price quotes between multiple dealers). Otherwise, a plaintiff must show a

systematic analysis of transactions over time to demonstrate that its treatment was the disfavored exception.

As we noted above, we have found no Indiana case to guide us in this determination. We must therefore predict how Indiana's highest court would decide the issue. *Edward E. Gillen Co. v. Ins. Co. of the State of Pa.*, 825 F.3d 816, 818 (7th Cir. 2016). In interpreting a state employment discrimination statute, the Indiana Supreme Court has adopted the burden-shifting approach employed in Title VII cases, see *Ind. Dep't of Envtl. Mgmt. v. West*, 838 N.E.2d 408, 414 (Ind. 2005), and so that seems a fair place to begin.

For purposes of Title VII, one method that a plaintiff can use to demonstrate discrimination on the basis of a protected category is to raise a presumption through a *prima facie* showing of a violation. To make this *prima facie* showing, the employee must show that she belonged to a protected class, was meeting the employer's expectations, suffered an adverse action, and was treated less favorably than those not in her class. At that point, the burden shifts to her employer to articulate a legitimate, nondiscriminatory reason. If the employer does so, the employee may then demonstrate that the employer's reasons were pretextual. *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973), as explicated in *Tex. Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248 (1981); *Filter Specialists, Inc. v. Brooks*, 906 N.E.2d 835, 839 (Ind. 2009).

But it is important to note a distinction with a difference that makes Title VII an imperfect analogy to the question in our case. Title VII does not prohibit all discrimination, nor does it prohibit all unfair discrimination. Title VII prohibits only discrimination on the basis of certain specified categories. Indiana's franchise-protection statute, on the other hand,

prohibits "unfair" discrimination among franchisees, but is silent about what exactly that covers (other than that it must be "in relation to the [franchise] agreement"). To analogize to the employment context, it would be akin to prohibiting a corporation from discriminating among its employees unfairly, without further detail.

Regardless of whether such a law may strike some as being overly protectionist or paternalistic, this is what Indiana's legislature decided was best for the state. The open-ended nature of the rule renders the familiar burden-shifting framework less helpful. The *McDonnell-Douglas* approach works in Title VII cases because it enables courts to isolate and control for a certain type of discrimination (race, sex, national origin, etc.). In order to employ that framework productively in this case, we would need to find a way to control for *unfair* discrimination.

Mohr argues that this is possible. All a plaintiff would need to show, it contends, is that for any given price concession on a like model, one party received a less generous concession than another. The disfavored party, it reasons, was the victim of forbidden discrimination. Once the plaintiff points to such a case, the franchisor would be required to come up with a legitimate reason for the difference and, if it could not, a jury would be entitled to infer that the discrimination was unfair. Mohr's approach, however, impermissibly places the burden of proof on the franchisor. Even in Title VII burden-shifting cases, the plaintiff has the ultimate burden of showing that intentional discrimination on the basis of a protected category took place.

The IFDA and IDFPA place the burden on the plaintiff—that is, Mohr—to show that any differences in treatment

among franchisees amounted to unfair discrimination. Mohr has attempted to do so with its evidence of the 13 individual transactions. The franchise agreement specified that the dealers would participate in the RSA program, to which each of the dealers had access. The program preserved Volvo's discretion to grant different concessions for each transaction, with the caveat that Volvo would grant the same concession to any dealers bidding on the same requests from the same customer. Under a normal bidding process, there is bound to be some variation between similar transactions. Not every unexplained variation in treatment, therefore, can be classified as unfair disparate treatment. For instance, it could be the case that the variations eventually equaled out among the franchisees, or that none of the variations in treatment among the franchisees was significant enough to be branded unfair.

Imagine, for example, that the terms of the agreement allowed Volvo to award price concessions randomly upon request from its dealers. Under such a plan, one franchisee might arbitrarily receive a price concession different from that received by another in similar circumstances. But it would not follow from that unexplained difference that the treatment was unfair. The same point applies here. While Mohr can show that it received an inexplicably inferior concession on similar transactions, it has not shown why we must equate the lack of an explanation with unfairness. The discrimination must be in relation to the franchise agreement, and the agreement in question allows for such discretion by its very terms.

This is not to say that a franchisee operating under similar terms could never make a showing of discrimination under the statute. For instance, a franchisee might be able to show that it was consistently awarded worse concessions than its

comparators. A franchisee could also show that a franchisor violated its agreement, offered it worse agreement terms than other franchisees, or discriminated against it by offering less favorable terms for the same purchase by the same customer. But what Mohr offered to the jury did not suffice to permit a finding of unfair discrimination. At most, the evidence showed that Volvo offered no reasoned explanation for giving Mohr a relatively worse concession than it gave to a sample set of other franchisees on similar transactions. But it did not show that such treatment was unfair or discriminatory (*i.e.*, that it was not the norm among franchisees).

We conclude, therefore that the district court erred in denying Volvo's motion under Rule 50(b). The 13 transactions on which Mohr relied showed no more than the fact that sometimes Mohr received the better concession and sometimes a competitor did. More is needed to show "unfair" discrimination. Given this conclusion, we have no need to say more about "cherry-picking" of data or about the territorial reach of Indiana's statute. Even if, as Mohr argues, it was permissible to rely on out-of-state comparators, that did not cure the fundamental problem with Mohr's case. We leave for another day—we hope in the Indiana courts—further consideration of the extraterritoriality point. For the record, we also reject Volvo's argument that statutory damages for unfair discrimination under Ind. Code § 23-2-2.7-2(5) could be restricted by a contractual limit on damages. The remedy for a statutory violation is provided by Ind. Code § 23-2-2.7-4, not by general principles of contract law. Moreover, another Indiana statute governing motor vehicle franchise agreements provides that it is "an unfair practice for a manufacturer or distributor to enter into an agreement in which a dealer is required to waive the provisions of: (1) this chapter; or

(2) IC 23-2-2.7." Ind. Code § 9-32-13-8 (allowing exceptions for voluntary agreements in which separate consideration is offered and accepted). If a manufacturer could nullify key protections of the IDFPA simply by inserting contrary language in its franchise agreements, the statutory protections would be worth very little. The point of the statute is to protect franchisees from unfair contractual terms and practices.

## IV

The next claim we address is Volvo's argument that Mohr breached the dealership agreement by failing to build a new facility in accordance with a promise Mohr allegedly made in the course of negotiations. The district court granted summary judgment in Mohr's favor in this point. Before this court, Volvo argues that this was wrong.

According to Volvo, while Mohr was in the process of applying to become a Volvo truck dealer, Mohr represented that it would build and relocate to a new and bigger facility within 11 to 13 months. As events unfolded, Mohr did not do so, and Volvo argues that this broken promise entitled it to terminate the agreement, because the dealer agreement allows Volvo to terminate the arrangement for misrepresentation of a material fact in connection with any application for appointment as a dealer. The district court found that the integration clause in the agreement, which provides that the agreement and its attachments "represent the entire agreement between the Company and the Dealer, superseding all prior oral and written agreements or other communications," bars this claim.

It is a general principle of Indiana law that "where the parties to an agreement have reduced the agreement to a written

document and have included an integration clause that the written document embodies the complete agreement between the parties … the parol evidence rule prohibits courts from considering parol or extrinsic evidence for the purpose of varying or adding to the terms of the written contract." *Krieg v. Hieber*, 802 N.E.2d 938, 943 (Ind. Ct. App. 2004). The mere existence of an integration clause, however, does not control whether a writing was intended to be completely integrated. *Judson Atkinson Candies, Inc. v. Kenray Assocs., Inc.*, 719 F.3d 635, 639 (7th Cir. 2013) (citing *America's Directories Inc. v. Stellhorn One Hour Photo, Inc.*, 833 N.E.2d 1059, 1067 (Ind. Ct. App. 2005)). The weight to be accorded to an integration clause will vary on the facts and circumstances of each particular case. *Franklin v. White*, 493 N.E.2d 161, 166–67 (Ind. 1986).

The Indiana Supreme Court has specified that one of the factors that can affect the significance of an integration clause is the sophistication of the parties. Where the parties occupy unequal bargaining positions, "the integration clause may not accurately express their meeting of the minds … ." *Id.* at 166. But where two sophisticated parties have engaged in extensive preliminary negotiations, the integration clause may be afforded more weight as a reflection of the final terms of their agreement. *Id.*

Volvo and Mohr are both sophisticated parties; both had experience with franchises and dealer agreements. As the district court noted, if the move to a new facility had been material to the decision to enter into the agreement, it ought to have been spelled out in the agreement. Moreover, even if Mohr included plans to build a new facility in its dealer application, those plans could have been foiled for any number of reasons. Volvo does not argue that Mohr never planned to

construct a new facility. Therefore, even if the integration clause did not bar the evidence, it would be quite a stretch to consider the inclusion of the plan to be a misrepresentation of a material *fact*, as opposed to the expression of a hope for the future relationship. We see no reason to disturb the district court's grant of summary judgment in Mohr's favor on this claim.

## V

Finally, we consider Mohr's cross-appeal, in which Mohr challenges the district court's rejection of its claim under the IFDA that Volvo intentionally misrepresented that it would provide Mohr with a Mack Truck franchise in exchange for operating a Volvo dealership. The district court granted judgment on the pleadings for Volvo on this claim, finding that Mohr could not reasonably have relied upon any such representation in light of the existence of the integration clause in the franchise agreement.

For purposes of this claim, the integration clause is no longer Mohr's friend. Mohr resists the implication of inconsistency, however, by noting that Indiana courts do not bar fraudulent inducement claims on the basis of integration clauses. It adds that allowing the district court's decision to stand would eviscerate the protections of the IFDA. Because this ruling was a judgment on the pleadings pursuant to Federal Rule of Civil Procedure 12(c), we ask whether the pleadings state a claim for relief that is plausible on its face, just as we do for challenges under Rule 12(b)(6). See *Adams v. City of Indianapolis*, 742 F.3d 720, 727–28 (7th Cir. 2014).

The IFDA makes it illegal:

(1) to employ any device, scheme or artifice to defraud;

(2) to make any untrue statements of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of circumstances under which they are made, not misleading; or

(3) to engage in any act which operates or would operate as a fraud or deceit upon any person.

Ind. Code § 23-2-2.5-27. Fraud and deceit under the IFDA include "any promise or representation or prediction as to the future not made honestly or in good faith … ." Ind. Code § 23-2-2.5-1.

As the district court noted, Mohr's allegations ordinarily would be sufficient to plead fraud under the IFDA. But Indiana courts understand the statute to include a requirement that a plaintiff have reasonably relied upon the misrepresentation. See *Hardee's of Maumelle, Ark., Inc. v. Hardee's Food Sys., Inc.*, 31 F.3d 573, 579 (7th Cir. 1994) (noting that the court would be inclined to follow holdings of the lower Indiana courts that the statute requires proof of reasonable reliance).

The district court found that the existence of the integration clause rendered any reliance unreasonable as a matter of law, as it rendered extrinsic evidence pertaining to the agreement between the parties inadmissible. Mohr argues on appeal that we ought to find that the integration clause (for these purposes) is invalid, because it otherwise would eviscerate the protections conferred by the IFDA. All a manufacturer need do to avoid liability under Indiana's statute, according

to Mohr, is to insert a non-negotiable integration clause in its agreement with a would-be franchisee.

But Indiana law already accounts for this potential abuse. As the Indiana Supreme Court has noted, the parol evidence rule is not procedural; it is a rule of preference and substantive law. *Franklin*, 493 N.E.2d at 165. Integration clauses are "to be considered as any other contract provision" and should be interpreted along with other relevant evidence on the question of integration. *Id.* at 166. As we noted above, some of the relevant evidence includes the circumstances in which the parties were contracting. If Mohr had been an unsophisticated party, or if there had been a greater imbalance in bargaining power, the integration clause might not bar evidence of an extrinsic promise and render reliance on it unreasonable. But those are not the facts before us.

Mohr also argues that the integration clause must be disregarded because Mohr's claim sounds in fraudulent inducement. The district court acknowledged that evidence regarding fraudulent inducement is not barred by an integration clause, but it also observed that fraudulent inducement requires that the material misrepresentation be of a past or existing fact and not, as in this case, a promise for the future. Mohr argues that the district court erred by applying the exception for this evidence only to common law fraudulent inducement claims, and not to claims under the IFDA.

Even if the principle applies to both types of claims, the problem of reliance remains. The undisputed facts show that these were sophisticated parties who knew, or should have known, that any terms or promises that were material to the Volvo dealership agreement ought to have been included in their contract. Because the agreement was silent about the

possibility of a future Mack truck dealership, Mohr cannot claim that it reasonably relied upon such a promise, and this aspect of its IFDA claim fails.

## VI

We therefore REVERSE the denial of judgment as a matter of law for Volvo, pursuant to Federal Rule of Civil Procedure 50(b), for the unfair discrimination claim that went to trial, and order that judgment be entered in Volvo's favor on this part of the case. We AFFIRM the court's summary judgment in Mohr's favor on the new-facility claim, and we AFFIRM its judgment under Rule 12(c) in Volvo's favor on the Mack claim. Each party is to bear its own costs on appeal.