In the
United States Court of Appeals
For the Seventh Circuit

No. 00-1955

Balkar Dhillon,

Plaintiff-Appellant,

v.

Crown Controls Corporation, et al.,

Defendants-Appellees.

Appeal from the United States District Court
for the Northern District of Illinois, Eastern Division.
No. 99 C 4428--George W. Lindberg, Judge.

Argued January 25, 2001--Decided October 23, 2001


  Before Coffey, Ripple, and Diane P. Wood,
Circuit Judges.

  Diane P. Wood, Circuit Judge.  The
standards for the admission of expert
testimony established in Daubert v.
Merrill Dow Pharmaceuticals, Inc., 509
U.S. 579 (1993), are not extremely rigid.
Yet they are not toothless, as this case
shows. The Daubert requirements ensure
that expert testimony is based on
reliable knowledge and methodology. When,
as in this case, an expert has not
engaged in any type of testing of his
offered "alternative design," it is not
an abuse of discretion for the district
court to refuse to allow such testimony.
Accordingly, we affirm the district
court's exclusion of the plaintiff's
expert testimony and the dismissal of the
plaintiff's complaint.

I

  As an employee in the shipping
department at Tandy Rank Video (Tandy),
Balkar Dhillon operated a stand-up
forklift truck. The truck had been
designed, manufactured, and distributed
by defendant Crown Controls Corp.
(Crown); defendant Crown Credit Company
leased it to Tandy. The truck model Tandy
had was designed to be operated from a
side-stance, stand-up position, at a
maximum speed of six miles per hour. The
operator compartment is fully enclosed

with the exception of a rear opening used to get on and off the truck. From the side-stance position, the operator is able to observe both the forward and the reverse direction of travel; the forks are to the operator's right and the opening in the compartment is to the operator's left. The truck's braking method operates in a way opposite of the traditional vehicle break--when the brake is depressed, the forklift will move; when the brake pedal is up, the brake is activated and the truck will not move.

On February 24, 1990, Dhillon was operating the forklift truck in reverse at about two miles per hour, heading for a telephone affixed to an I-beam so that he could respond to a page. For some reason, Dhillon allowed the forklift to get too close to the beam; fearing a collision, he attempted to shift the truck into the forward gear rather than apply the brake. When he shifted gears, the truck jerked, causing his left leg to slip out of the operator's compartment and become pinned between the beam and the truck. Dhillon suffered severe and permanent injury to his leg and sued Crown in strict liability and negligence.

In his suit, Dhillon did not argue that there were any defects particular to the forklift he had been using; after the accident, the truck was used and inspected and found to be in proper working order. Instead, he claimed that the design of the truck was defective because the truck did not have a rear door (rather than just the opening) on the operator's compartment that would have prevented his leg from falling off the truck. Additionally, Dhillon complained about the truck's braking systems, the operator's controls, and the inadequacy of the instructions and warnings.

The district court had removal jurisdiction based on diversity of citizenship between Dhillon (an Illinois citizen) and the defendants, which were all incorporated and with their principal places of business in Ohio; the amount of alleged lost wages alone exceeded $100,000. Prior to trial, the plaintiff sought the admission of evidence to be provided by two expert witnesses, John B. Sevart, a mechanical engineer, and Dr. Gerald Harris, a biomechanical engineer.

Both would have testified about an alternative design--an operator's compartment with a rear door--and would have opined that Crown's failure to equip the truck with a rear door was the proximate cause of Dhillon's injuries and that adding a rear door would not have increased any risks to the operator. Sevart also would have stated that Crown was negligent in failing to provide appropriate warnings and instructions as to the availability of a rear door. Harris was prepared to add that a rear door would have prevented Dhillon's injury. Dhillon had no expert who would have addressed the design of the braking system or the operator's controls. The court, after applying Daubert, concluded that neither Sevart's nor Harris's testimony was entitled to pass through the evidentiary "gateway" that case establishes. Finding that without this expert testimony Dhillon could not possibly prevail, the court granted summary judgment for the defendants on March 13, 2000, and dismissed the suit.

II

We review de novo whether the district court's grant of summary judgment was proper. That is the case only when there is no genuine issue of material fact (or, as we sometimes put it, the record reveals that no reasonable jury could find for the moving party), and the moving party is entitled to judgment as a matter of law. See Karazanos v. Navistar Int'l Transp. Corp., 948 F.2d 332, 335 (7th Cir. 1991). Because Dhillon does not dispute the district court's conclusion that, without the proffered expert testimony, he could not prevail, we only review the district court's exclusion of the expert testimony.

Under Federal Rule of Evidence 702 and the principles of Daubert, a district court judge is to act as a "gatekeeper" for expert testimony, only admitting such testimony after receiving satisfactory evidence of its reliability. 509 U.S. at 589. We note that the district court's ruling was made prior to the April 17, 2000, amendment to Rule 702, which took effect on December 1, 2000. That amendment was designed to "affirm[ ] the trial court's role as gatekeeper and pro vide[ ] some general standards that the trial court must use to assess the

reliability and helpfulness of proffered expert testimony." Fed. R. Evid. 702, advisory committee's note, 2000 amendments. Because the district court evaluated the evidence under the then-prevailing Daubert framework, and because we see nothing in Dhillon's case that would be affected by the amendment, we too look principally to the pre-amendment cases./1 Under Daubert, the court is to determine (1) whether the expert will testify to valid scientific or other expert knowledge based on sound methodology and (2) whether the testimony will assist the trier of fact with a fact at issue. 509 U.S. at 592. Even prior to the amended rule, the Supreme Court had established that expert testimony that is more technical than scientific is governed by the same criteria as the admission of scientific expert testimony. Kumho Tire Co. v. Carmichael, 526 U.S. 137, 141 (1999). Neither party disputes that the district court judge properly applied the Daubert framework. We therefore review the decision to exclude Dhillon's proffered expert testimony only for abuse of discretion, asking whether the judge has relied on a forbidden factor or failed to consider an essential factor. See General Electric Co. v. Joiner, 522 U.S. 136, 139 (1997); Smith v. Ford Motor Co., 215 F.3d 713, 717 (7th Cir. 2000).

With regard to the first tier of analysis, Daubert offers a non-exclusive list of factors to aid judges in determining whether particular expert opinion is grounded in reliable scientific methodology. Among the factors articulated are: (1) whether the proffered theory can be and has been tested; (2) whether the theory has been subjected to peer review; (3) whether the theory has been evaluated in light of potential rates of error; and (4) whether the theory has been accepted in the relevant scientific community. Daubert, 509 U.S. at 593-94.

We could identify a number of problems with the testimony these witnesses were prepared to offer, but the most glaring among them is the lack of testing, or more generally the failure to take any steps that would show professional rigor in the assessment of the alternative designs (or, as the amended rule puts it, that the testimony is "the product of

reliable principles and methods"). Although both experts wanted to assert that the truck design was defective because it did not include a rear door, neither expert has actually designed a model of a forklift truck with a rear door. Nor has either performed any tests of such a model to see if it is both economically feasible and just as safe or safer than the model without the door. In alternative design cases, we have consistently recognized the importance of testing the alternative design. See Bourelle v. Crown Equip. Corp., 220 F.3d 532, 535-38 (7th Cir. 2000); Cummins v. Lyle Industries, 93 F.3d 362, 368 (7th Cir. 1996). In deciding whether an alternative design is appropriate, an expert needs to look at a number of considerations: "the degree to which the alternative design is compatible with existing systems . . .; the relative efficiency of the two designs; the short- and long-term maintenance costs associated with the alternative design; the ability of the purchaser to service and to maintain the alternative designs; the relative cost of installing the two designs; and the effect, if any, that the alternative design would have on the price of the machine." Cummins, 93 F.3d at 369. Many of these considerations are product- and manufacturer-specific and cannot be reliably determined without testing. Id. This case illustrates why these questions are crucial. In some environments, the record suggests that the presence of a rear door could exacerbate injuries to the operator by slowing an escape from a forklift tipping over or falling off of a dock.

It turns out that Sevart (at least) did conduct tests in 1991 and 1997 of forklift trucks with and without rear doors, but that does not improve Dhillon's case. These tests were not put before the court, they were not otherwise made part of the record, they were performed after Sevart had already formed his opinion, and they were performed on a differently designed truck with a different operator's position. Furthermore, Sevart did not explain how these past tests had led to his conclusions about the need for a rear door. Without a more detailed explanation of these tests and Sevart's methodology, a court cannot possibly assess the tests' reliability, and the defendant cannot

attempt to duplicate the results. Of course, hands-on testing is not an absolute prerequisite to the admission of expert testimony, but the theory here easily lends itself to testing and substantiation by this method, such that conclusions based only on personal opinion and experience do not suffice. See Cummins, 93 F.3d at 369.

With regard to the inadequate warning/instructions claim, the same requirements apply. Sevart has not designed or suggested to the court an alternative warning that would have been appropriate or tested its effectiveness. See Bourelle, 220 F.3d at 539 ("The fact that [the expert witness] never even drafted a proposed warning renders his opinion akin to 'talking off the cuff' and not accepted methodology.").

Of course, Daubert is a flexible test and no single factor, even testing, is dispositive. See Kumho Tire, 526 U.S. at 151-52; Smith, 215 F.3d at 719. But there is no evidence that the experts' testimony satisfies the other Daubert guideposts used to examine reliability of the methodology. Neither Sevart nor Harris has provided any evidence that the rear door proposal has been favorably subject to peer review or generally accepted in the relevant communities. The plaintiff could not point to even one forklift manufacturer that has installed rear doors for general application or even one regulatory body or standards organization that requires or recommends a rear door on forklift stand-up trucks. To the contrary, the record shows that Sevart has twice tried to persuade the professionals on the American National Standards Institute committee to require a rear door; the committee has twice rejected the idea.

For the second tier of the analysis, the Supreme Court has directed the courts to consider whether the testimony assists the trier of fact in understanding the evidence or determining a fact in issue. Daubert, 509 U.S. at 591-92. This second tier analysis is fatal to the testimony of Dr. Harris regarding his "biomechanical" testimony that a leg can fall through an opening and a leg cannot fall out through a closed door. In his brief, plaintiff's counsel stated that "[p]lain ordinary common sense tells us

if one is standing straight and there is a sudden jerking movement, one's body will tend to fall one way or another depending upon the direction of the motion. Going one step further in plaintiff's case it is clear that because there was no door on the left side his leg went out; if there was a door the left leg would have stayed in. It's that simple. It really shouldn't take a rocket scientist to figure this one out." We agree that such an idea is based on common sense. This means, however, that the district court was well within bounds to conclude that expert testimony on the effect of a rear door to keep an operator's legs in the compartment was inadmissible. "[A]n expert . . . must testify to something more than what is 'obvious to the layperson' in order to be of any particular assistance to the jury." Ancho v. Pentek Corp., 157 F.3d 512, 519 (7th Cir. 1998). Of course, the jury could have been assisted by testimony on whether a rear door would be economically feasible or safe in the case of a tip-over. But, as we explained above, neither Sevart nor Harris had per formed the proper analyses to allow them to provide such testimony.

This is not the first time that we have encountered a fork- lift accident in which the principal theory focused on the design of the lift. In Bourelle, 220 F.3d 532, a product liability case, the plaintiff's expert claimed that an alternative design (a larger wire cage surrounding the operator) and an alternative warning should have been implemented. We upheld the district court's determination that the testimony was not admissible under Daubert. Like the experts here, the expert in Bourelle admitted that: (1) he had not prepared a model of his alternative design nor a proposed warning; (2) he had not done any testing of the alternative design or warning to show that they were both safer and economically feasible; (3) no lab or organization had tested his designs; (4) no manufacturer had incorporated the pro posed designs; and (5) no organization had approved of his theories. Id. at 537- 38. Although Dhillon's case was pending before June 2000, when Bourelle was decided, Bourelle appeared a good six months before oral argument in this case, and it would be hard to have a closer precedent to follow. We do so here and

AFFIRM the district court's dismissal of
the plaintiff's complaint on summary
judgment grounds.

FOOTNOTE

/1 The amended rule allows the district court, after
assessing the expert's qualifications, to admit
expert testimony if "(1) the testimony is based
upon sufficient facts or data, (2) the testimony
is the product of reliable principles and meth-
ods, and (3) the witness has applied the princi-
ples and methods reliably to the facts of the
case." Fed. R. Evid. 702.