In the

# United States Court of Appeals

### For the Seventh Circuit

No. 08-2370

KEVIN SCHMUDE,

*Plaintiff-Appellee,*

*v.*

TRICAM INDUSTRIES, INC.,

*Defendant-Appellant.*

Appeal from the United States District Court
for the Eastern District of Wisconsin.
No. 07 C 457—**William C. Griesbach**, *Judge.*

ARGUED JANUARY 7, 2009—DECIDED FEBRUARY 17, 2009

Before POSNER, RIPPLE, and ROVNER, *Circuit Judges.*

POSNER, *Circuit Judge.* Before us is the appeal in a diversity suit for personal injury, and if there were any substantive issues they would be governed by Illinois law, but there aren't any. The plaintiff fell off a ladder at work, injuring his back severely; he is a manual worker, and as a result of his injury is no longer employable. The ladder was defective, and he sued the manufacturer. The only issue at trial was whether the defect had caused the accident—one can of course fall off a defective ladder

and be injured without the fall having been precipitated by the defect. The jury awarded the plaintiff $677,000 in damages, and the defendant does not question the size of the award. Its objections to the judgment, discussed and rejected by the district judge in a lucid and thorough opinion reported at 550 F. Supp. 2d 846 (E.D. Wis. 2008), are procedural.

The plaintiff was doing construction work in a building. He needed to check a panel in the ceiling for a possible short circuit. He erected an eight-foot fiberglass ladder that had been manufactured by the defendant. The plaintiff testified that he was standing halfway up the ladder, reaching into a space in the ceiling with his hands, when he fell off the ladder, landing on his back. The gravity of his injury may have been due to the fact that he weighs 350 pounds.

The ladder collapsed with him, and one of the rivets that fastened the rear legs of the ladder to the platform at the top of the ladder was found on the floor; and the leg had separated from the ladder. The plaintiff's expert, an experienced designer of mechanical products, testified that in the manufacturing process the rivet had been misaligned with the hole through which it was supposed to pass and as a result had not securely fastened the leg to the platform. He thought that the rivet had fallen out when the plaintiff opened or climbed up the ladder and that the loss of the rivet had caused the ladder to collapse or wobble, in either event precipitating the plaintiff's fall.

The defendant complains about discrepancies between the expert's report and his testimony. For example, the

report states that the rivet simply fell out of the ladder and was undamaged; in fact, as he testified at trial, the rivet had broken. We cannot see what difference that makes. A more serious complaint is that the plaintiff's expert performed no test to determine whether the misalignment of the rivet with the hole could cause the ladder to collapse. But the defendant has never explained what kind of test could be performed to determine that, except to remove the same rivet from an identical ladder, have a 350-pound man climb halfway up and start poking with his hands in the ceiling, and see what happens. In fact the defendant tried to conduct such a test, and the jury was suitably unimpressed. A ladder (the same model as the one that collapsed) was set up, with a screwdriver inserted in the place where the rivet would have been had it been properly aligned. A 215-pound man climbed halfway up the ladder. He was holding on to the ladder, for dear life as it were, when a string attached to the screwdriver jerked it out of the hole. The platform dropped about a half inch, and the guinea pig did not fall off. Had he weighed another 135 pounds, had he not been holding on to the ladder with both hands, and had he been startled by the movement of the platform rather than anticipating a movement, he might be the plaintiff in a similar lawsuit.

The defendant also objects to the judge's having permitted the plaintiff's expert to demonstrate to the jury how the accident might have occurred. Using (it appears—the record is not completely clear) the very ladder that had collapsed, the plaintiff's expert jerked the rear leg assembly, as one would do in opening a ladder, and

the leg with the missing rivet became detached from the platform. The objection is that the expert's report did not mention that he was planning to conduct such a test. But it was not a test; it was merely a demonstration to the jury of what can happen when a rivet is missing. The demonstration could just as well have been performed by the plaintiff's lawyer. There was no suggestion that the expert used expert knowledge in jerking the ladder's rear leg.

The only other issues in the case relate to limitations that the judge placed on the defendant's efforts to impeach (undermine) the plaintiff's testimony. His testimony was crucial in two respects. First, he testified that he wasn't doing anything on the ladder that might have caused him to fall regardless of the defect in the ladder. He did not have a clear recollection of the accident itself—he testified that one moment he was standing on the ladder looking for the short circuit and the next moment he was on the floor. But nothing he said indicated that he might have lost his balance for a reason unrelated to any unexpected movement of the ladder; he testified that he was trying to be careful. There were no other witnesses to the accident. And the plaintiff's testimony relating to the pain caused by the injury to his back was the only evidence that related to that aspect of his claim for damages.

This was a very close case, since even if the plaintiff's testimony is believed, it is only slightly more likely that he fell because the rivet gave way than that he fell because, as anyone who has ever stood on a ladder knows, it

is hard to keep one's balance if one doesn't have at least one hand on the ladder—though of course the fact that it is so easy to fall off a ladder makes a defect that can cause a ladder to wobble extremely dangerous.

The plaintiff had been convicted in 1995 of the sale of firearms without a federal license by a convicted felon, and had been sentenced to 88 months in prison. Rule 609(b) of the evidence rules provides that evidence of a felony conviction more than ten years old (the present case was tried in 2008) is admissible to impeach a witness's testimony only if the probative force of the evidence substantially outweighs its prejudicial effect. The judge ruled that the evidence met this standard, and so he permitted the defendant's lawyer to ask the plaintiff on the stand whether he had been convicted of a felony. But the judge limited the description of the felony to the sale of firearms without a federal license—the lawyer was not permitted to ask the plaintiff whether he had been convicted of the felony of the sale *by a felon* of firearms without a federal license. That felony, obviously, had also been committed more than ten years before the trial, and the judge did not think the mention of it would satisfy the standard in Rule 609(b) for admitting evidence of prior acts to impeach a witness's testimony.

We have some qualms about the judge's having rewritten history, so that the jury was given an erroneous description of the felony of which the plaintiff had been convicted. The cases do permit the "sanitization" of prior-crimes evidence used to impeach, but they mean by this just concealing the nature or name of the crime, e.g., *United*

*States v. Stokes*, 211 F.3d 1039, 1042-43 (7th Cir. 2000); *United States. v. Hursh*, 217 F.3d 761, 768 (9th Cir. 2000); *United States. v. Clark*, 184 F.3d 858, 867 (D.C. Cir. 1999), and the judge went further here. But had he not, he would have had an unsatisfactory choice between allowing the jury to hear about two old convictions or about none. The defendant argues that its lawyer had not intended to tell the jury what the predicate conviction for the firearms offense had been. But this forbearance would have done nothing to resolve the judge's dilemma, for the jury would have wanted to know what that conviction had been for, and it would have been better that it be told than that it be left to speculate.

The judge made a reasonable choice in the difficult circumstances that he faced. Allowing a prior conviction to be used to impeach a witness's testimony is controversial. E.g., Teree E. Foster, "Rule 609(a) in the Civil Context: A Recommendation for Reform," 57 *Fordham L. Rev.* 1, 17-37 (1988). It is in tension with the most elementary conception of the rule of law—what Aristotle called "corrective justice," which means judging the case rather than the parties. It is an aspiration that is given symbolic expression in statues of Justice as a blindfolded goddess—blindfolded because she is not seeing the individual characteristics of the parties and their lawyers: their party affiliation, standing in the community, family, personal attractiveness, record of achievement, social class, ethnicity, and so forth. In the federal judicial oath corrective justice is called deciding "without respect to persons." And so a felon is entitled to the same consideration of the merits of his case as a litigant who has never

been convicted of a felony, and that entitlement is under-
mined by allowing a party to a lawsuit to draw the
jury's attention to the fact that his opponent is a convicted
felon. "[E]ven a murderer has a right to be free from
torture and the correlative right to present his claim of
torture to a jury that has not been whipped into a frenzy
of hatred. At the argument of the appeal the lawyer for
the officers—who had been the prosecutor at Wilson's
criminal trials—acknowledged in answer to a question
from the bench that he had tried to make the jury hate
Wilson." *Wilson v. City of Chicago*, 6 F.3d 1233, 1236 (7th Cir.
1993).

The rationale for nevertheless allowing a prior crime
to be used to undermine testimony is that a person who
has committed a serious crime is more likely than a law-
abiding person to lie on the stand even if the case in
which he is testifying has nothing to do with that crime.
The rationale is underinclusive, since many people
who have committed a felony have not been caught or
if caught have not been convicted, because of the prosecu-
tion's heavy burden of proof. Moreover, every judge is
aware that many people who do not have a criminal
record will lie in a trial when it is to their advantage.

A rule is a rule; Rule 609 does permit the use of a
felony conviction to impeach a witness and it is not our
place to question that use, or the judge's decision (though
we may not have made it ourselves) that the 1995 con-
viction had enough probative force to overcome its prejudi-
cial effect. The relevance of the considerations discussed
in the preceding paragraph is that they support the

reasonableness of the district judge's decision to exclude the mention of the earlier conviction; its probative value would have been slight and its prejudicial effect considerable.

The rule-of-law concerns that we have expressed have even greater force with regard to the other effort at impeachment that the defendant was forbidden to attempt. The plaintiff testified that he has been unable to find work since his accident because he has psychological problems that limit the type of job that he can do. His injury prevented him from doing manual labor, and he cannot do many other jobs because he cannot do work that involves significant interaction with other people, whether customers or coworkers. Previous employers testified that the plaintiff was diligent and competent. But his injury prevents his doing the kind of work that he had done for them.

If a tortfeasor inflicts a graver loss on his victim than one would have expected because the victim had some pre-existing vulnerability, that is the tortfeasor's bad luck; you take your victim as you find him. That is the famous "eggshell skull" rule of tort law, illustrated by our decision in *Stoleson v. United States*, 708 F.2d 1217 (7th Cir. 1983). But the defendant wanted to show that the plaintiff did not suffer from a psychological problem but rather that he had "creat[ed] psychological impediments to employment" and that his "anti-social" attitudes "were solely in his power to control." To this end the defendant sought to introduce in evidence the following excerpt from a report by a vocational counselor who had interviewed the plaintiff:

Interpersonal skills/acceptance: He indicated that he does not like people and tries to avoid them. He said that his PO [parole officer] had him go to see a therapist because of his antisocial behavior. *He explained to me that he would probably if he saw a person lying bleeding to death walk right over the person but that if there was a hurt dog next to him he would stop and help the dog.* I asked if he would go up to people that he worked with and socialize and he said that he would sit in a corner or not go to lunch at all to avoid people. He said that he did not have any anger issues at work but that he did get suspended from work because he would not show up for mandatory meetings and other "crapola". He said he would also get suspended for not doing his mandatory reports. I asked what type of reports and he indicated it was travel expenses. He said that he had a neighbor girl do them because he did not understand how a computer worked and could not get the information in there right . . . . *He also mentioned that he really did like being in prison that he was able to thrive there.*

The judge allowed into evidence the entire passage minus the sentences that we have italicized, which he excluded under Rule 403 of the evidence rules. That rule, the converse of Rule 609(b), provides that relevant evidence should be excluded if its probative value is substantially outweighed by (so far as pertinent to this case) its prejudicial effect.

The prejudicial effect is obvious, the probative value nil. The admitted portions of the passage make clear that

the plaintiff is indeed seriously lacking in "interpersonal skills/acceptance." He does not like people and tries to avoid them; his parole officer—another reminder of his criminal past—made him see a therapist. The italicized passages are a credit to the plaintiff's candor, but would be taken by many people to mark him as a monster. To allow them into evidence would have made the trial a trial of the man, not of the case. Their irrelevance to the issues would have signaled to the jury that it could consider, in arriving at a verdict, whether the plaintiff was a good man or a bad man.

The defendant's theory seems to be that the plaintiff pretends to be a monster so that no one will hire him, for if he had found a job after the accident, or at least had prospects of finding one in the future, his damages would be less. But it is impossible to believe that had the italicized passages been admitted into evidence the defendant's lawyer would have argued to the jury that the plaintiff just pretends to like dogs more than people and prison more than freedom. The lawyer would not have tried to rehabilitate the plaintiff's character.

The plaintiff's lawyer told us at argument without contradiction that, although he had grown to like him, his client is a frightening-looking man—huge (for he is six foot two inches tall as well as weighing 350 pounds), with a full beard, and a not particularly pleasing manner, including while testifying (though this is not apparent from the trial transcript), and of course an ex-con. It is a tribute to the jury, and to the judge's conduct of the trial, that despite the closeness of the case, which would

have made it easy for the jury to return a verdict for the defendant had it allowed emotion to influence it, the plaintiff won. He must have impressed the jurors with his candor, his lack of pretense—he did not pretend to be something other than what he is.

The judgment in favor of the plaintiff is

AFFIRMED.